NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2343
_____

BASSEM KANDIL; FLORA KANDIL
SAMEH A. ABOELATA; HALLA KANDIL,

Appellants

v.

GARY YURKOVIC, POLICE OFFICER;
ANTHONY MARK ABODE, POLICE OFFICER;
WILLIAM C. OELS, III, POLICE OFFICER; WILLIAM OELS, JR., SERGEANT;
EDWARD T. BOBADILLA, POLICE OFFICER;
CHIEF OF POLICE; CITY OF NEW BRUNSWICK;
CITY OF NEW BRUNSWICK POLICE DEPARTMENT;
MIDDLESEX COUNTY PROSECUTOR'S OFFICE;
MIDDLESEX COUNTY CORRECTIONAL FACILITY, JOHN DOE
SUPERVISING OFFICERS 1-10; JOHN DOES 1-10; ABC CORPS, 1-10

_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 2-06-cv-04701)
District Judge:  Honorable Dennis M. Cavanaugh
_____

Submitted Under Third Circuit LAR 34.1(a)
September 20, 2011
_____

Before:  AMBRO, CHAGARES, and ALDISERT, <u>Circuit Judges</u>

(Opinion filed: October 17, 2011 )

_____

OPINION
_____

AMBRO, <u>Circuit Judge</u>

Appellants Bassem Kandil and his family members appeal from a summary judgment entered against them by the District Court. Kandil argues that it improperly withheld jurisdiction over his case and that, as a matter of public policy, the release-dismissal agreement he signed should not be enforced against him. For the reasons that follow, we hold that federal jurisdiction exists over this case and that there are genuine issues of material fact as to the enforceability of the agreement. Accordingly, we vacate the District Court's judgment and remand.

## I.    Background

New Brunswick, New Jersey police officers arrested Kandil in October 2004. He was charged with aggravated assault, resisting arrest, and disarming a police officer. A Middlesex County grand jury subsequently indicted Kandil on these charges. In the ensuing months, both the State and Kandil conducted discovery. The State also offered Kandil a plea agreement, which he declined. Throughout these proceedings and in this appeal, the same counsel has represented Kandil.

In October 2005, Judge Frederick DeVesa of the Superior Court of New Jersey held a status conference. At that conference, Assistant Prosecutor Marcia Silva renewed the State's plea offer. However, the State declined to enroll Kandil in the Pretrial Intervention program ("PTI"), which would have suspended the charges against him

2

during two years of supervised release, after which the charges would be dropped. Judge DeVesa then invited the parties' counsel into his chambers for an off-the-record negotiation. During that negotiation, he learned that Kandil had filed a Notice of Tort Claim under the New Jersey Tort Claims Act. The parties' counsel then reached a compromise: Kandil could enroll in the PTI program, but in exchange he would waive all civil claims against State entities and officials.

Kandil applied for admission to the PTI program the very day of the status conference. However, ten days later, the Probation Department denied Kandil's application. To justify its denial, the Department cited the violent nature of Kandil's alleged offense, the public need for prosecution, and the gravity of what might have occurred had Kandil wrested control of the officer's weapon. On learning of this denial, Assistant Prosecutor Silva (who had promised Kandil's admission to the program) sought an override of the denial from First Assistant Prosecutor Julia McClure. McClure granted the override, provided that Kandil attend anger management classes and, again, waive all civil claims.

In November 2005, the parties returned to Judge DeVesa's courtroom for a PTI enrollment hearing. There, the State formally enrolled Kandil in the PTI program. Judge DeVesa also specifically questioned Kandil and his counsel about Kandil's waiver of any civil claims. Both Kandil and his counsel affirmed that they understood the implications of that waiver. The parties stipulated that they would sign a written release-dismissal agreement waiving civil claims by December 2, 2005.

3

In September 2006, Kandil filed this civil case in the District Court, having never signed a release-dismissal agreement waiving those claims. Kandil's claims against the police officers include common-law tort claims and claims under 42 U.S.C. § 1983. The Probation Department, observing that a waiver of precisely such claims was a condition of Kandil's enrollment in the PTI program, filed a Notice of Motion for Termination in February 2007. Thereafter, Kandil signed a release-dismissal agreement releasing all civil claims arising out of his arrest, including the pending matter in the District Court. This agreement satisfied the Probation Department, and Kandil completed the PTI program in November 2007. Therefore, the underlying criminal charges against Kandil were dismissed.

The defendants, citing Kandil's written release of his claims against them, moved in the District Court for summary judgment. In granting the motion, the Court held that it lacked jurisdiction under the *Rooker-Feldman* doctrine (discussed below) and, in the alternative, that Kandil's release-dismissal agreement is enforceable against him as a matter of public policy. Kandil now appeals to our Court both grounds of that holding. For the reasons that follow, we agree with Kandil at least that there is a genuine issue of material fact and that summary judgment was thus inappropriate. We therefore vacate the District Court's grant of summary judgment and remand.

## II. Discussion

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review in the summary judgment context is plenary. Thus, "we are required to apply the same test that the district court should have utilized

4

initially." *Jackson v. Danberg*, 594 F.3d 210, 215 (3d Cir. 2010) (quotation marks and citation omitted).  Summary judgment is appropriate only when there are no genuine issues of material fact, drawing all justifiable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

A.      *Rooker-Feldman Doctrine*

The District Court held that it lacked jurisdiction over this case because of the *Rooker-Feldman* doctrine.  We disagree.

That doctrine, which takes its name from two Supreme Court cases, generally withholds jurisdiction of federal courts (save the United States Supreme Court) over state judgments, as they are more appropriately appealed within the state judiciary.  *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923).  It is narrow in scope.  The Supreme Court has explained that it "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).  We have distilled *Exxon*'s holding into the following four-part test, each part of which must be satisfied: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010) (quotation marks and citation omitted).

5

This case does not meet those criteria.[1]  Kandil did not "lose" in state court.  The state court order at issue is Judge DeVesa's Order of Postponement (of Kandil's criminal charges) that memorializes the parties' compromise: the State would suspend its charges against Kandil, which it did, and Kandil would waive any civil charges against State actors, which he (eventually) did.

More importantly, the injuries that Kandil asserts in this suit and on appeal were not "caused by the state-court judgment."  The core of Kandil's complaint is his tort and § 1983 claims against the police officers.  Those claims existed before any state court case; the state-court judgment in no sense "caused" those alleged injuries.  *See Great W. Mining*, 615 F.3d at 166-68 (citing examples of injuries that do and do not meet this criterion and offering the "timing of the injury" as a "useful guidepost" for resolving the question); *Turner v. Crawford Square Apts. III, L.P.*, 449 F.3d 542, 547 (3d Cir. 2006) ("Turner's complaint raised federal claims, grounded on the FHA, *not* caused by the state-court judgment but instead attributable to defendants' alleged FHA violations that preceded the state-court judgment.") (emphasis in original).

Kandil does not technically "complain" that his waiver caused injury, as waiver is asserted against him as an affirmative defense.  Nonetheless, his waiver is in effect the main issue before us.  He argues that his release-dismissal agreement is unenforceable,

---

[1] The District Court relied on one of our pre-*Exxon* holdings to conclude that *Rooker-Feldman* applies.  However, *Exxon* is read as a narrowing of our Court's earlier *Rooker-Feldman* jurisprudence.  Thus, we have noted that "caution is now appropriate in relying on our pre-*Exxon* formulation of the *Rooker-Feldman* doctrine."  *Gary v. Braddock Cemetery*, 517 F.3d 195, 200 n.5 (3d Cir. 2008).

which is a question of contract law and public policy. That a state-court order recited that the waiver was in exchange for entry into the PTI program is, for *Rooker-Feldman* analysis, of no import. In this respect, Kandil's position is like that of the plaintiff in *Skinner v. Switzer*, 131 S. Ct. 1289 (2011). He lost in state court, then sued in federal court to challenge the constitutionality of the state laws under which he was convicted. The Court held that *Rooker-Feldman* did not bar his claim. *Id.* at 1298. Similarly here, Kandil challenges the legality of the contract that would govern the state court decision, not a state court decision itself.

We conclude that the *Rooker-Feldman* doctrine does not preclude jurisdiction in this case. We must thus consider the District Court's alternative basis for its holding – that Kandil's waiver of civil claims is enforceable and requires judgment against him.

### B. Release-Dismissal Agreement

The District Court held that even if it had jurisdiction, Kandil's release-dismissal agreement must be enforced against him, barring this suit. We hold that there are genuine issues of material fact, and thus we vacate and remand.

Our law places few limits on the substance of contractual bargains. In particular, parties may give up important legal rights to gain a benefit they seek, provided that their agreement is knowing and voluntary. *See, e.g.*, *Brady v. United States*, 397 U.S. 742 (1970) (holding that plea agreements are enforceable). However, the Supreme Court has constrained the enforceability of agreements that waive civil suits in exchange for release from prosecution, such as the release-dismissal agreement in this case. *See Town of Newton v. Rumery*, 480 U.S. 386 (1987).

7

*Rumery* establishes two requirements for a release-dismissal agreement to be enforceable. First, the agreement must be voluntary. 480 U.S. at 393-94. We answer the question of voluntariness with reference to "the knowledge and experience of the defendant, the severity of the criminal charges, whether a legitimate criminal justice objective supports the release, whether the defendant was represented by counsel, and whether the execution of the release was judicially supervised." *Livingstone v. North Belle Vernon Borough*, 12 F.3d 1205, 1210 (3d Cir. 1993) (*en banc*) ("*Livingstone I*") (quotation marks and citation omitted). Second, enforcement of the agreement must be in the public interest, an inquiry that emphasizes avoiding prosecutorial misconduct. *Rumery*, 480 U.S. at 395-96. The burden is on the civil-case defendants to "show that upon balance the public interest favors enforcement." *Cain v. Darby Borough*, 7 F.3d 377, 381 (3d Cir. 1993) (*en banc*). In this context, we ask whether the facts known to the prosecutor at the time of the agreement support the proffered public interest reason for the agreement and whether the proffered reason is the prosecutor's actual reason for seeking the agreement. *Livingstone v. North Belle Vernon Borough*, 91 F.3d 515, 527 (3d Cir. 1996) ("*Livingstone II*").

Kandil concedes that the release-dismissal agreement was knowing and voluntary. *See* Kandil Br. at 8, 28. The *Rumery* Court found it important that the plaintiff was a businessman. Kandil is an auto salesman and finance manager. The *Rumery* Court found it important that the plaintiff was not in jail when he made the agreement. Kandil was not in jail. The *Rumery* Court found it important that an experienced criminal lawyer represented the plaintiff. Kandil has been represented throughout this case by a lawyer

8

who was an assistant prosecutor for nine years. The *Rumery* Court found it important that the plaintiff's lawyer had drafted the agreement. Kandil's lawyer drafted the agreement. The *Rumery* Court found it important that the plaintiff had three days to consider the agreement. Kandil had much longer between Judge DeVesa's suggestion of the agreement on October 18 and Kandil's decision to enroll in the PTI program, thereby committing to the agreement on November 9. We therefore agree that Kandil's agreement was voluntary.

The second question, whether enforcement of Kandil's agreement is in the public interest, is more challenging. The officials seeking the agreement's enforcement must present a legitimate public-interest reason why they sought the waiver. In this context, the "public interest" has included subjecting the agreement to judicial supervision, avoiding stress on defendants and key witnesses, avoiding the costs of prosecution, and avoiding frivolous civil lawsuits. *See Livingstone II*, 91 F.3d at 527-30. We then subject this reason to an "objective" and a "subjective" analysis. The "objective" analysis asks whether the facts known to the prosecutor at the time of the agreement suffice to establish that it was in the public interest. The "subjective" analysis asks whether the reason proffered was in fact the reason that the prosecutor sought the agreement.

Defendants advance three reasons why they asked Kandil to waive his civil claims in exchange for admission to the PTI program. First, they contend that the prosecutors, Silva and McClure, admitted Kandil to the program for legitimate reasons that included his lack of criminal history and the fact that he merely unholstered the officer's weapon rather than seizing it. Second, they argue that because Judge DeVesa was the first to

9

suggest the release-dismissal agreement, the prosecutors did not seek the agreement to cover their own misconduct. Third, Kandil's civil suits, they offer, would be marginal and judicial resources are better used elsewhere. They base this argument on internal investigations by the police department absolving the officers of bias and excessive force.

Our "objective" analysis of these three reasons raises questions about whether they suffice to establish that the release-dismissal agreement was in the public interest. The first reason might illuminate why the prosecutors enrolled Kandil in the PTI program, but it says little about why waiver of civil suits was a precondition. Indeed, the prosecutors knew those facts—that Kandil merely unholstered the officer's weapon, that he had no criminal record, that he was employed and married—before the October 2005 status conference. Yet at that status conference they refused to enroll Kandil in the PTI program. Only after the status conference, once the waiver of civil claims was on the table, did the prosecutors change their mind.

The second reason, that Judge DeVesa suggested the agreement, is far from the kind of judicial supervision that would put the agreement in the public interest. The parties dispute that Judge DeVesa, as opposed to the prosecution, suggested the agreement, as their conference was off the record. Even if Judge DeVesa did suggest the agreement, he hardly supervised it. At the PTI enrollment hearing, he noted that "I see here in the proposed order for the Court's signature that the defendant as a condition of Pretrial Intervention intends to execute some type of a [hold] harmless agreement against [the] officers . . . ." App. 506. This remark does not show close scrutiny or an awareness of the merits of Kandil's civil claims.

10

The third proffered reason, that Kandil's civil suits appeared marginal or frivolous, requires closer analysis. In *Livingstone II*, we wrote that unless "unusually strong public interests" support the other reasons, prosecutors must conduct an "individualized analysis" of the plaintiff's potential civil claims before seeking a release-dismissal agreement. 91 F.3d at 529 & n.16. In this case, the police department's internal investigations are the kind of case-specific inquiry that *Livingstone II* requires. However, as in *Livingstone II*, the District Court here did not consider whether these investigations were enough to support the conclusion that Kandil's civil claims were marginal or frivolous. More importantly, as in *Livingstone II*, "[i]t is not now clear whether [the prosecutors] considered the marginal or frivolous nature of [Kandil's] claims" in deciding to seek a waiver. *See* 91 F.3d at 530 n.17. Rather, the only reasons they offered at their depositions were that Judge DeVesa had suggested the waiver and that Kandil had agreed to it. App. 411 (McClure), 499 (Silva). Thus, as in *Livingstone II*, we remand "so that the parties can address the question of whether [Kandil's] civil claims were regarded—and, if so, whether they were properly regarded—by the prosecuting attorney as marginal or frivolous." 91 F.3d at 530.

Our "subjective" analysis of appellees' proffered reasons raises still more questions. In September 2005, before anyone suggested that Kandil waive his civil claims, Kandil's counsel submitted discovery evidence of police misconduct to the prosecutors. That evidence, consisting largely of interviews with witnesses and an interrogatory answered by Officer Yurkovic, suggests an alternate motive for the release-dismissal agreement. It indicates that Yurkovic was having a "casual sexual relationship"

11

with a woman named Pamela, that Kandil and his friends were conversing with Pamela and her friend on the night of the incident, that Yurkovic arrived and demanded Kandil's driver's license on observing him with Pamela, and that Yurkovic may have thereafter cursed, mocked Kandil's home town of Flemington, and grabbed Kandil. App. 600-09, 635-36.

Defendants do not challenge this evidence directly. Rather, they note that no discovery about these events has been undertaken in this civil case, as opposed to Kandil's criminal case. Appellee Br. at 72. More importantly, they emphasize that prosecutors reviewed Kandil's discovery evidence and concluded that they should proceed with their prosecution in spite of it. *Id.* at 18, 69, 73. However, the record on which defendants found their assertion suggests that the official in the prosecutor's office responsible for allegations like Kandil's may have only "flipped through" the discovery materials before concluding that "there doesn't seem to be a problem here." App. 819. Regardless of the thoroughness of the inquiry into the discovery, the record establishes that the prosecutors were aware of this evidence of misconduct before they sought the release-dismissal agreement. As in *Livingstone II*, that awareness "lends credence to the inference" that the prosecutors' subjective motivation for pursuing the waiver agreement was not purely in the public interest. *See* 91 F.3d at 533.

The record contains other evidence tending to make the prosecutors' subjective motivation a genuine issue of material fact. In early November 2005, about a month and a half after Abramowitz determined that Kandil's discovery evidence did not present a problem, Assistant Prosecutor Silva spoke to First Assistant Prosecutor McClure. In that

discussion about enrolling Kandil in PTI, she raised "this issue of the two girls [Pamela and her friend] and were they there and weren't they there and that kind of thing." App. 498. "This issue" may thus have been relevant to the prosecutors' decision to put Kandil in the PTI program in exchange for his release-dismissal agreement. The same deposition testimony reveals that this prosecutor's office had no history of requiring release-dismissal agreements to enroll in the PTI program. App. 496. That one was required in this case, and only in this case, could suggest that they paid additional attention to their decision.

On this important question of the agreement's public-interest merits, the District Court is silent. It properly states the law and recognizes that the question demands an objective and a subjective analysis. However, in holding that *Rumery* does not bar enforcement of the agreement, the Court observes only that Kandil received the benefit of his bargain and that he was represented by counsel.

We therefore vacate and remand the judgment of the District Court so that it might assess in the first instance whether, under *Livingstone II*, enforcement of Kandil's release-dismissal agreement is in the public interest. On remand, the parties may wish to address more thoroughly the prosecutors' motives for seeking the agreement and the relationship of Kandil's discovery evidence to that decision. Evidence such as the deposition testimony of First Assistant Prosecutor McClure, which was provided to us only in part, may be pertinent to making this assessment.