NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0672n.06

No. 13-2011

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 27, 2014
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| DAVID MARSHALL AND CHANDRA MARSHALL, | ) ) |
| | ) ON APPEAL FROM THE |
| Plaintiffs-Appellants, | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| v. | ) DISTRICT OF MICHIGAN |
| | ) |
| CITY OF FARMINGTON HILLS, et al., | ) OPINION |
| | ) |
| Defendants-Appellees. | |

BEFORE: KEITH, BATCHELDER, and STRANCH, Circuit Judges.

**DAMON J. KEITH, Circuit Judge.** Plaintiff David Marshall entered into a release-dismissal agreement with the City of Farmington Hills ("the City"), whereby his pending criminal charges were to be dismissed if a) he released the City from civil liability, and b) the two parties could agree to the wording of a press release. The parties could not agree to a press release and Plaintiffs filed this action in the district court. The City filed a motion to dismiss, which the district court granted. We reversed that decision and remanded to the district court to determine the validity of the original release-dismissal agreement. The district court found the agreement valid, and again dismissed the action. Plaintiffs appealed this decision to our Court. We **REVERSE** the decision of the district court and **REMAND** for proceedings consistent with this opinion.

I.

On December 13, 2006, Plaintiff David Marshall, an African-American Detroit police officer, was pulled over while off-duty after running a red light in Farmington Hills, Michigan, where he resides. Marshall, who was in uniform at the time, was ordered to exit the vehicle and to remove his service weapon. Marshall stated that he was leery of motioning towards his firearm, refused to remove it, and instead requested that the officers, who were white, call a supervisor to assist the scene. Upon arrival of the supervisor, who was also white:

> When [the supervisor] exited his vehicle, Meister reached for Mr. Marshall's weapon, but Mr. Marshall pushed his arm away. Meister yelled, 'That's it!' and Jarrett immediately returned to his patrol car and retrieved an electronic stun gun known as a TASER weapon.

Marshall was twice tasered, and, while incapacitated, the officers removed his firearm. Marshall was arrested, brought to the Farmington Hills police station, and ordered to strip to his underwear. Marshall was charged with obstructing law enforcement, and his arraignment was scheduled for January 8, 2007.

Roughly seven months prior to this incident, Marshall had physically disciplined his son. Consequently, the Farmington Hills Police Department undertook an official inquest into allegations of child abuse. According to the lead detective on the case, Stacey Swanderski, the City Attorney failed to contact her, and, as to the best of her knowledge, the case was closed as of August, 2006. On December 13, 2006, the same day of Marshall's arrest, Swanderski's supervisor, Scott Cronin, was contacted by *his* supervisor about the status of the child abuse investigation. In turn, Cronin contacted Swanderski at home (while she was on medical leave) to likewise inquire. The re-initiation of the matter culminated with the Farmington Hills Police

Department's decision to send the misdemeanor child abuse file to the Oakland County Prosecutor's Office. That office then charged Marshall with child abuse on January 5, 2007.

With the obstruction charge still pending,[1] Marshall went to trial on the child abuse charge. Marshall won. Following this resolution, on June 21, 2007, the parties—the Marshalls, or "Plaintiffs," and "the City"—put a conditional settlement agreement on the record before the state judge. The terms of the conditional agreement (the "release-dismissal") were that the City would dismiss the obstruction charges and Plaintiffs would release the City from liability, contingent upon the parties (1) reaching agreement on the exact wording of a press release about the dismissal of the charges, and (2) agreeing on the terms of a release of civil liability.

The parties were unable to reach an agreement as to the exact wording of the press release. Marshall submitted revisions to the City's initial draft, which included the following edits: "NO Deal, Come Again"; "Hell NO"; NO Way (twice); "more neutral"; and a giant "X" struck through the entire document. In turn, the City submitted a revised draft. Both drafts relayed that the charges against Marshall had been dismissed and included the statement: "[t]he disposition of this case in no way reflects negatively on my officers' excellent work records or professional reputations."

Plaintiffs assert that the City was recalcitrant in failing to acknowledge that its officers were involved in wrongdoing, and that, as per Marshall's attorney, the City did not want to fully exonerate Marshall. According to Marshall's attorney: "I spoke with Mr. Meads on numerous occasions and made proposals to Mr. Meads about what needed to be in, what needed to be out.

---

[1] Marshall avers that during the period of time in which the obstruction charge was pending, Farmington Hills police officers routinely parked their squad cars near his home, often for long period of time. Marshall objected to the continued surveillance.

A couple times he went back to the Chief and one or two times he said the Chief is never going to go for that." "Chief Dwyer's main concern was a press release and how the public was going to perceive, as I recall, letting Mr. Marshall off the hook, if you will, for lack of a better term. So we could never get past the wording of the press conference . . . ."

At a hearing on August 14, 2007, Marshall, having viewed any further negotiations as futile, requested a trial date on the obstruction charge. The trial judge declined to grant his motion and held that the release-dismissal was valid, even though the parties failed to agree to the language of the press release. The court stated:

> My read of this is that this case is over . . . . [I]t's interesting to note that maybe there's a holdup for a press release. Frankly, something that happened [earlier], now that it's August 14th is probably moot anyway. I'm not sure that the press has any great interest in this file and the Court does have a public record which notes a dismissal and if the press is interested, that's certainly what the court file would show.

The state court, issuing the ruling from the bench, dismissed the criminal obstruction charges and found the parties to be bound by the terms of the release-dismissal agreement. The state court later issued a perfunctory order stating "that Plaintiff's Motion for Trial Date is hereby denied [and the criminal charges] are dismissed with prejudice."

Nevertheless, on July 29, 2009, Plaintiffs filed suit in the Eastern District of Michigan, alleging violations of 42 U.S.C. §§ 1983 and 1985, as well as state law claims of loss of consortium, assault and battery, excessive force, and false arrest. On November 3, 2009, Defendants filed an amended motion for summary judgment, arguing that Plaintiffs' suit was barred by collateral estoppel. In a March 1, 2010 opinion, the district court dismissed the suit, finding that the release-dismissal agreement barred Plaintiffs' civil suit and that they were

collaterally estopped from challenging the validity of the release-dismissal. Plaintiffs appealed to this Court, and we reversed and remanded on May 1, 2012. Specifically, we remanded to the district court to evaluate the validity of the release-dismissal agreement, directing the district court to consider whether the "agreement was voluntary; [whether] there is . . . evidence of prosecutorial misconduct, and [whether] enforcement of this agreement would . . . adversely affect the relevant public interests." *Marshall v. City of Farmington Hills*, 479 F. App'x 661, 665 (6th Cir. 2012).

On April 3, 2013, the state court entered a written order *nunc pro tunc*[2] explicitly incorporating the oral statements made during the original 2007 hearing. Subsequently, and on this basis alone, the district court, in an opinion issued on July 2, 2013, held that Marshall voluntarily entered into the release-dismissal agreement, that the agreement was valid and enforceable, and that it barred Plaintiffs' claims. Accordingly, the district court granted the City's motion to dismiss. Marshall appeals.

II.

Although Defendants labeled their motion a "motion to dismiss," Defendants employed the standard used for summary judgment motions under Federal Rule of Civil Procedure 56.

---

[2] Translated as "now for then." The initial state court ruling was orally made from the bench ("My read of this is that this case is over . . . ."). On appeal to our Court, we considered whether "the state court's verbal order properly functions as a valid and final determination for purposes of collateral estoppel. To be an enforceable final judgment under Michigan law, the ruling must be expressed in a written order, not an oral pronouncement." *Marshall v. City of Farmington Hills*, 479 F. App'x 661, 663-64 (6th Cir. 2012) (citing *Tiedman v. Tiedman*, 400 Mich. 571, 255 N.W.2d 632, 634 (1977)). We held that it did not and thus remanded to the district court to determine the validity of the release-dismissal agreement under state law with respect to the collateral estoppel issue, among other things. In the interim, the state court entered a written *nunc pro tunc* order (see *Sleboede v. Sleboede*, 384 Mich. 555, 559, 184 N.W.2d 923, 925 (1971)), and, accordingly, the district court found that this resolved the collateral estoppel issue. As will be explained in section IV, *infra*, we fail to see how collateral estoppel applies in this case.

Accordingly, our review is *de novo*. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013). Under this standard, the Court construes all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. The dispute over a material fact must be "genuine, that is, if the evidence is such that a reasonable juror could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted). After considering all of the record evidence, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A).

### III.

We remanded this matter to the district court to determine whether the policies underlying § 1983 render the release-dismissal unenforceable as matter of federal law. *Marshall*, 479 F. App'x. at 665. Although release-dismissal agreements are not *per se* illegal, *see Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987), "[t]he availability of such agreements may threaten important public interests" embodied in our civil rights laws, *id* at 395 (plurality opinion). As Justice O'Connor explained:

> Permitting such releases may tempt public officials to bring frivolous criminal charges in order to deter meritorious civil complaints. The risk and expense of a criminal trial can easily intimidate even an innocent person whose civil and constitutional rights have been violated. The coercive power of criminal process may be twisted to serve the end of suppressing complaints against official abuse, to the detriment not only of the victim of such abuse, but also of society as a whole.

*Id*. at 399. (O'Connor, J., concurring in part and concurring in the judgment). We therefore review release-dismissals on a case-by-case basis. *Salkil v. Mount Sterling Twp. Police Dep't*, 458 F.3d 520, 529 (6th Cir. 2006). A release-dismissal is enforceable only if a court "specifically determine[s]" that: (1) it was entered into voluntarily; (2) there is no evidence of prosecutorial misconduct; and (3) enforcing the agreement "will not adversely affect relevant public interests." *Coughlen v. Coots*, 5 F.3d 970, 974 (6th Cir. 1993). The burden of proof in this analysis "falls upon the party in the § 1983 action who seeks to invoke the agreement as a defense." *Id*. Defendants have not met their burden with respect to either voluntariness or prosecutorial misconduct, and, accordingly, on either basis we must reverse.

### A. Voluntariness

We begin with the first prong, that in order for a release-dismissal to be enforceable, the City must show that the agreement was the result of "an informed and voluntary decision." *Rumery*, 480 U.S. at 393. Although *Rumery* provides multiple guideposts to assist us in determining whether Marshall entered into the release-dismissal agreement,[3] because we find that Marshall did not wish to enter into the agreement, but rather that his participation in the release-dismissal was judicially compelled, we conclude that he did not enter into the agreement voluntarily. The parties here acknowledged that a release-dismissal agreement would be entered if the parties agreed 1) to the wording of a press release, and 2) to terms releasing the City from civil liability. Because the parties never agreed to the wording of the press release—a condition

---

[3] These guideposts include: (1) The sophistication of the criminal defendant; (2) whether the defendant was in custody when he made the agreement; (3) whether the defendant was represented by counsel who drafted the agreement; and (4) whether the defendant had ample time to consider the agreement before signing it. *See Rumery*, 480 U.S. at 394.

precedent necessary to the execution of the release-dismissal—a deal was never reached. Accordingly, the state court's conclusory statement that an agreement *was reached* is belied by the record. Marshall was bound by an agreement into which he did not wish to enter, and thus his participation cannot be said to be "an informed and voluntary decision." *Rumery*, 480 U.S. at 393; *see also Crampton v. Ohio, decided with McGautha v. California*, 402 U.S. 183, 213 (1971) (observing, in the arena of plea agreements, the defendant's right to choose whichever course he likes).

Although we believe that Marshall plainly did not voluntarily enter into the release-dismissal, we address the district court's conclusion that because Marshall unilaterally ceased negotiations on the press release, he failed to negotiate in good faith and thus he lost his right to challenge the validity of the agreement. *Marshall,* 2013 WL 3328292, at *7. The district court applied state contract law in evaluating the release-dismissal. *See, e.g., Gonzalez v. Kokot*, 314 F.3d 311, 316-18 (7th Cir. 2002); *Kandil v. Yurkovic*, 448 F. App'x 228, 232 (3d Cir. 2011); *Contra Rumery*, 480 U.S. at 393 (drawing a parallel to criminal plea agreements); *see also* 42 U.S.C. § 1988.

We begin by observing that in Michigan, adherence to the duty of good faith is normally a question of fact for the jury that should not be resolved by summary judgment. *See Pemberton v Dharmani*, 207 Mich. App. 522, 529, n.1 (1994); *Karibian v. Paletta*, 122 Mich. App. 353, 359 (1983). This rule is followed in the federal courts as well. *See Safeco Ins. Co. of Am. v. City of White House, Tenn.*, 36 F.3d 540, 548 (6th Cir. 1994); *Liberty Heating & Cooling, Inc. v Builders Square, Inc.*, 788 F. Supp. 1438, 1449 (E.D. Mich. 1992). It is undisputed that Marshall

abandoned negotiation on the press release after one set of revisions and demanded a trial. However, the record evidence, taken in the light most favorable to Marshall, suggests that the negotiation was more protracted than as articulated in the district court's opinion, which failed to properly credit the import of Marshall's attorney's negotiations. Though Plaintiffs did not introduce a formal counter-proposal, Marshall's attorney testified that he "would be surprised if [he didn't submit a counter proposal]." Marshall's attorney testified that he spoke with the City attorney "on *numerous occasions* and made proposals to [him]." However, with respect to forcing the City to admit wrongdoing, Marshall's attorney was told that "the Chief is never going to go for that." That the City had already issued statements clearing the officers of wrongdoing and categorizing Marshall's behavior as uncooperative further support the contention that the City drew a hardline stance. Taking Marshall's reasonable inferences as true, as we must, *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587, that Marshall's attorney testified that he spoke with the City attorney on numerous occasions and that the City had made their stance clear on a triable issue, leads us to believe that Marshall negotiated in good faith.[4]

Moreover, Marshall's contention that continuing to negotiate would have been "an exercise in futility," also contains merit. *See Safeco Ins. Co. of Am.*, 36 F.3d at 548 ("Of course, good faith does not require the doing of a futile act."). Although the city *did* incorporate some of Marshall's requested deletions, both draft revisions clear the officers and the department of all

---

[4] Marshall's case differs from the paradigmatic cases in which a party "avoids[s] liability on the contract for the failure of a condition precedent where they caused the failure of the condition." *Harbor Park Mkt., Inc. v. Gronda*, 277 Mich. App. 126, 131, 743 N.W.2d 585, 588 (2007); *see, e.g., Mehling v. Evening News Ass'n*, 374 Mich. 349, 352, 132 N.W.2d 25, 26 (1965) (where plaintiffs refuse to even meet with the defendants to reach an agreement, condition inoperable); *Lee v. Desenberg*, 2 Mich. App. 365, 369, 139 N.W.2d 916, 918 (1966) (where owner of the property refuses to complete sale, sells to another or settles his rights after prevailing, he prevents the occurrence of the condition). The key difference in these cases is that the specific terms and issues of the agreement have generally already been negotiated and agreed upon, whereas here material issues were left unresolved.

wrongdoing and fail to avow responsibility. Concededly, Marshall's revisions were less than conciliatory. However, if Marshall was convinced that he would not obtain public exoneration to a reasonable satisfaction—to the point that he would risk going to trial—then he had no duty to accept the press release and was free to reject the counter-offer and withdraw from the contract. *See Knox v. Knox*, 337 Mich. 109, 118, 59 N.W.2d 108, 112 (1953) ("If the condition is not fulfilled, the right to enforce the contract does not come into existence."). Indeed, as Marshall's attorney noted, the fact that Marshall "would rather go to trial and . . . put [his] job on the line, [and] risk everything to prove [he] didn't do anything wrong," indicates that the failure to reach an agreement was likely more reflective of the parties' diametric understanding of the events as they occurred on December 16, 2006, than anything else. The state court, in making its oral pronouncement, gave this prototypical negotiation roadblock short shrift.[5]

Though the district court paints a landscape of an unjustified unilateral action by Marshall, the record evidence controverts this finding. The jury could certainly find that Marshall justifiably abandoned negotiation, having found that proceeding as such would be futile. Marshall's "unilateral action" was only a byproduct of the City's unilateral disavowal of any declaration of wrongdoing; the City's hardline stance begot Marshall's contumacy. Simply put, we find that the two parties just could not agree, for which neither party should be penalized. *See, e.g., Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1223-24 (7th Cir. 1988) (If the parties

---

[5] The judge, at the August 14, 2007 hearing, mischaracterizes the agreement between Marshall and the City and failed to acknowledge that more than perfunctory negotiation had taken place. According to the judge, "the parties placed an agreement on the record to resolve all of the issues in this case and other issues surrounding it," and held that "an agreement on the record is in fact a binding agreement as to all parties . . . [e]veryone is bound by the agreement." The judge's error lies in the stated finality: the parties agreed to a *conditional* agreement and, indeed, two conditions were precedent in this matter, the satisfaction without which there would be no finality to the agreement.

negotiate in good faith, yet fail to reach agreement, they will not be subject to liability); *F.D.I.C. v. Altholtz*, 4 F. Supp. 2d 80, 86-87 (D. Conn. 1998) (the failure to come to an agreement does not constitute a breach of the covenant of good faith and fair dealing).

In any event, "whether further efforts at compliance were futile needs to be decided by a trier of fact," and was improperly dismissed at the summary judgment stage. *See Safeco Ins. Co. of Am.*, 36 F.3d at 548. Because "[t]he evidence, when viewed in a light most favorable to [Plaintiffs], raises a genuine issue concerning [the] good faith performance of the conditions precedent sufficient to withstand a motion for summary judgment," we hold that the district court erred in dismissing the action on this ground. *Davidson & Jones Dev. Co. v. Elmore Dev. Co., Inc.*, 921 F.2d 1343, 1351 (6th Cir. 1991). Accordingly, we find that the City has not met its burden to show that Marshall waived the condition precedent and that the release-dismissal agreement was not entered into voluntarily.

### B. Prosecutorial Misconduct

Shifting to the second prong of the *Rumery* analysis, we find that the City has not carried its burden of rebutting the substantial evidence that recurring police and prosecutorial misconduct rendered the release-dismissal invalid under federal law. The existence of prosecutorial misconduct is to be determined by the court, rather than by a jury. *Hill v. City of Cleveland*, 12 F.3d 575, 579 (6th Cir. 1993). Thus, the City, seeking to dismiss Marshall's action on the grounds of a validly executed release-dismissal, must show by a preponderance of the evidence that there was no prosecutorial misconduct. *See Burke v. Johnson*, 167 F.3d 276, 284 (6th Cir. 1999).

We may not prejudge the plaintiff's § 1983 claim and will look for "the existence of substantial evidence of police misconduct in a particular case . . . since [such evidence] could be probative of the motives of the prosecutor for seeking such an agreement, as well as the degree to which enforcing the agreement would serve the public interest." *MacBoyle v. City of Parma*, 383 F.3d 456, 459 (6th Cir. 2004) (internal quotation omitted). Substantial evidence of prosecutorial misconduct may be found both through direct prosecutorial action and "substantial evidence of *police* misconduct." *Coughlen*, 5 F.3d at 974 (emphasis added). "Examples of such prosecutorial misconduct would include situations where, following their use of [(1)] excessive force, [(2)] police officers file unfounded criminal charges as bargaining chips to cover up their own conduct or to induce the victim to give up his cause of action; or where [(3)] a prosecutor, upon discovering that the victim has a meritorious civil claim, files frivolous criminal charges in order to protect the police officers." *Id.*; *see also Salkil v. Mount Sterling Twp. Police Dep't*, 458 F.3d 520, 529 (6th Cir. 2006).

Plaintiffs can substantively claim all three. On the facts presented in the record, we observe five possible and interrelated instances of police and prosecutorial misconduct: 1) the initiation of the then-dormant child abuse investigation (which lay dormant for *seven months* and was revived *on the day of his arrest*, and for which Marshall was acquitted) as a punitive measure for threatening suit; 2) repeatedly tasering a uniformed police officer and then forcing the officer to strip to his underwear; 3) continued nighttime police surveillance on Marshall's house; 4) the merits of Marshall's obstruction charge (specifically whether the exit order was proper for running a red light); and 5) the City's less than good faith negotiation tactics, namely

an insistence on insulating the officers from any admission of wrongdoing. These facts suggest that the "coercive power of criminal process was being twisted to serve the end of suppressing complaints against official abuse, to the detriment not only of the victim of such abuse, but also of society as a whole." *Coughlen*, 5 F.3d at 974 (internal quotations omitted). Plaintiffs have thus made a case that Defendants improperly dissuaded them from taking civil action. We conclude that the City has not met its burden to show, more likely than not, there was not substantial misconduct.

### C. *Public Interest*

The least well-defined element of a *Rumery* analysis is the consideration of whether enforcement of the agreement will "adversely affect the relevant public interests." *Coughlen*, 5 F.3d at 975 (quoting *Rumery*, 480 U.S. at 393). A "court reviewing the release-dismissal agreement could conclude that the public's interest in vindicating constitutional rights and deterring police misconduct by permitting a specific civil complaint to go forward, despite a release, outweighs a general prosecutorial interest in helping to manage a heavy case load." *Id*. Where criminal prosecution is threatened *after* it becomes clear that the victim is considering a civil claim—as here, where the City filed otherwise dormant child abuse charges—the public interest in vindicating constitutional rights and deterring police misconduct is apparent. *Lynch v. City of Alhambra*, 880 F.2d 1122, 1128 (9th Cir. 1989).

In many cases a defendant's choice to enter into a release-dismissal agreement will reflect a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action. *Rumery*, 480 U.S. at 393.

13

However, that Marshall "would rather go to trial and . . . put [his] job on the line, risk everything to prove [he] didn't do anything wrong," indicates that an agreement was, perhaps, not a reasonable expectation, and indicates that this is clearly a risk that he is willing to take. Moreover, although the possibility of abuse is "clearly mitigated if the release-dismissal agreement is executed under judicial supervision," *Rumery*, 480 U.S. at 402, the judge's perfunctory handling of the matter was alarming. The judge's statement that "[m]y read of this is that this case is over . . . . Frankly, something that happened [earlier], now that it's August 14th is probably moot anyway. I'm not sure that the press has any great interest in [this matter]," and the subsequent issuance of an *oral dismissal* do not appear to possess the heralds of attention commensurate with this type of matter. As the D.C. Circuit observed in *Dixon v. D.C.*, 394 F.2d 966, 969 (D.C. Cir. 1968):

> The major evil of these agreements is not that charges are sometimes dropped against people who probably should be prosecuted. Much more important, these agreements suppress complaints against police misconduct which should be thoroughly aired in a free society. And they tempt the prosecutor to trump up charges for use in bargaining for suppression of the complaint. The danger of concocted charges is particularly great because complaints against the police usually arise in connection with arrests for extremely vague offenses such as disorderly conduct or resisting arrest.

Marshall's charges fall within the range of extremely vague offenses, and befit a serious possibility of abuse. Accordingly, we find that "the public's interests in vindicating constitutional rights and in deterring police misconduct" outweighs the general prosecutorial interest in this matter. *Coughlen*, 5 F.3d at 975.

IV.

As a final matter, we address the district court's conclusion that Marshall's action is foreclosed by the doctrine of collateral estoppel. We must disagree.

We begin by observing that this is *not* a case in which a former criminal defendant brings parallel state and federal civil claims for relief, where a judgment from the former would preclude a judgment in the latter. Rather, this is a case in which a state defendant files only a single federal civil rights claim in federal court. Normally, the state criminal court's decision to dismiss the defendant's criminal charges should have no effect on the federal court's ability to hear the civil dispute. "The interpretation and validity of a [waiver] of [federal claims] is governed by federal law." *Stroman v. West Coast Grocery Co.,* 884 F.2d 458, 461 (9th Cir. 1989). We are aware of no case in light of *Rumery* in which a state criminal court may prevent a federal court from exercising its duty to adjudicate the validity of a release-dismissal agreement *under federal law*. *See Rumery,* 480 U.S. at 392 ("[The] question whether policies underlying that statute may in some circumstances render that waiver unenforceable is a question of federal law.").

Implicit in many federal challenges to a release-dismissal agreement is a ruling by the original state court that the release-dismissal agreement was valid under state law. *See, e.g., MacBoyle v. City of Parma*, 383 F.3d 456 (6th Cir. 2004); *Burke v. Johnson*, 167 F.3d 276 (6th Cir. 1999); *Coughlen v. Coots*, 5 F.3d 970 (6th Cir. 1993); *Hill v. City of Cleveland*, 12 F.3d 575 (6th Cir. 1993); *see also Livingstone v. North Belle Vernon Borough*, 12 F.3d 1205, 1213 (3d Cir. 1993) (invalidating a release-dismissal "notwithstanding the presence of a judge"). In each of these cases, the release-dismissal agreement was approved by a state court. In none of these

cases did the court consider the defendant precluded from bringing a federal action challenging the waiver of his right to a § 1983 action simply because a state court accepted the challenged agreement. A holding to the contrary would allow state criminal courts to block a defendant's right to seek review of his federal claim in federal court.[6] We see no reason to break with our prior caselaw and create a rule that would render release-dismissal agreements impervious to review—precisely the outcome *Rumery* forbids.

Collateral estoppel requires that (1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment, (2) the same parties had a full and fair opportunity to litigate the issue, and (3) there was mutuality of estoppel. *Estes v. Titus*, 481 Mich. 573, 751 N.W.2d 493 (2008); *accord Wolfe v. Perry*, 412 F.3d 707, 716 (6th Cir. 2005); Restatement (Second) of Judgments § 27 (1982). Collateral estoppel does not apply here because the *Rumery* issue and the facts underlying the *Rumery* issue simply were not litigated before the state criminal court. The parties did not argue about whether police and prosecutorial misconduct rendered the release-dismissal void under federal law; the state court made no findings about whether such misconduct had occurred, nor did it mention *Rumery* or any related legal principle. We cannot apply collateral estoppel to a question of law or fact that was neither litigated nor determined. *Cf. Montana v. United States*, 440 U.S. 147, 164 n.11 (1979) ("Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation.").

---

[6] The dissent's reasoning would have the effect of preventing a defendant from obtaining meaningful review of his release-dismissal in *any court*. *See infra* note 7.

We also conclude that Marshall was not provided a full and fair opportunity to litigate the *Rumery* issue or its component elements. "In determining whether the party opposing collateral estoppel has had a full and fair opportunity to adjudicate his or her claim, a court must take into consideration the choice of forum and incentive to litigate." *People v. Trakhtenberg*, 493 Mich. 38, 50 (2012) (internal quotations and citations omitted); *accord Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 333 (1971). Indeed where the defendant has a "different and most likely stronger incentive to litigate" the issue in a different forum, the defendant is not said to have had a full and fair opportunity to litigate. *Trakhtenberg*, 493 Mich. at 50.

Here, Marshall seeks to have the validity of the waiver of *his federal constitutional rights* assessed in federal court. His choice of forum was not state criminal court (which is not the place to litigate a civil claim), but the federal district court. Marshall clearly had a "stronger incentive to litigate" the denial of his federal right before a federal judge rather than the same judge overseeing the release-dismissal, which is precisely why Marshall filed his federal constitutional action in federal court. We refuse to hold that a state criminal court's decision to accept a release-dismissal may circumvent the defendant's right to redress simply by stating that a case is "essentially over." If a defendant wishes to challenge his release-dismissal, a waiver of a substantive federal right, he is able to do so by bringing a § 1983 claim in state or federal court.

We also observe that Marshall also had no functional ability to appeal the state criminal court's decision. As we stated in our previous ruling, "the district court remarkably would require Marshall to appeal the final order dismissing the criminal charges against him—a move a criminal defendant has little incentive to make—as his only means to avoid an adverse decision

on equitable grounds. It would be a peculiar result for us to determine that equity requires a criminal defendant to appeal a successful dismissal of criminal charges and we decline to do so." *Marshall*, 479 F. App'x. 665. There is no issue preclusion if appellate review could not have been obtained of the judgment in the first action. *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 647 (2006); *Bradley v. Reno*, 749 F.3d 553, 556 (6th Cir. 2014); *Wehrli v. Cnty. of Orange*, 175 F.3d 692, 695 (9th Cir. 1999); 18A Charles Alan Wright et al., Federal Practice and Procedure § 4433 (2d ed.2013); 1 Restatement, Judgments 2d, § 28(1) (1982). Forcing a defendant to appeal his *criminal dismissal* in such a case would be a bizarre and inequitable result indeed. Accordingly, without feasible appellate review, the "judgment" fails to hold preclusive effect on this ground, as well.

V.

The release-dismissal is unenforceable under federal law. We **REVERSE** the judgment of the district court, and **REMAND** for proceedings consistent with this opinion.

**ALICE M. BATCHELDER, Circuit Judge, dissenting.** The Michigan state court here decided that the release-dismissal agreement between Marshall and the City "was voluntarily, understandingly[, and] freely made," and therefore, upheld the agreement as enforceable and dismissed the criminal charges against Marshall and his associated request for a trial. *See Marshall v. City of Farmington Hills*, 479 F. App'x 661, 662–63 (6th Cir. 2012). The district court dismissed Marshall's federal court action, holding that Marshall was collaterally estopped from relitigating the release-dismissal issue, on which all his federal claims depend. Because the state court did not mention the release-dismissal agreement in its written order, however, this Court reversed the district court's decision to dismiss. But as a result of this Court's reversal, the state court amended its prior order and incorporated in its *nunc pro tunc* order its verbal ruling regarding the release-dismissal agreement. The state court's amended order was the missing element for collateral estoppel to attach; thus, Marshall's claims in federal court regarding the release-dismissal agreement are barred by collateral estoppel. Because the majority opinion incorrectly denies the collateral-estoppel effect of the state court's amended order and instead renders a decision on the merits of Marshall's claims, I must dissent here.

"The federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). A party may move for summary judgment in federal court on the ground that earlier litigation in a different court "decided an issue of fact or law necessary" to the judgments of both courts. *See id.*; 10B Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* §2735 (3d ed. 1998). "[C]ollateral estoppel relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial

resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen*, 449 U.S. at 94. Collateral estoppel is not limited to cases that arise in federal court, but also applies to federal cases that raise issues already litigated in state courts. Indeed, according to 28 U.S.C. § 1738, "judicial proceedings [of any court of any State] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State. . . ." Thus, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen*, 449 U.S. at 96.

Federal civil rights litigation is no exception. "[T]he legislative history of § 1983 does not in any clear way suggest that Congress intended to repeal or restrict the traditional doctrines of preclusion." *Allen*, 449 U.S. at 98. Rather than subtract from the jurisdiction of the state courts, § 1983 simply adds to the jurisdiction of the federal courts. *See id.* at 99. "There is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all." *Id.* at 104. Thus, state-court judgments have collateral-estoppel effect, as measured by state law, on issues raised in subsequent federal civil rights litigation. *See id.* at 105; Wright & Miller, *supra*, § 4471.2. The only way to defeat such collateral-estoppel effect is to show that "the state court did not afford a full-and-fair opportunity to litigate." Wright & Miller, *supra*, § 4471.2; *see also Allen*, 449 U.S. at 95.

Here, for collateral estoppel to apply in Michigan, three elements must be satisfied: "(1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment, (2) the same parties had a full and fair opportunity to litigate the issue, and (3) there was mutuality of estoppel." *Estes v. Titus*, 751 N.W.2d 493, 500 (Mich. 2008). As this Court previously noted, "There is no question that the [City] raised the validity of the release-dismissal and submitted it to the [Michigan state] court for determination during the August 14, 2007 hearing." *Marshall*, 479 F. App'x at 663. Thus, the same parties now before this Court had a full and fair opportunity to litigate the validity of the release-dismissal agreement. *See Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 847 (Mich. 2004) (holding that relitigation is permitted only when the party against whom preclusion is sought could not appeal the initial judgment). Furthermore, mutuality is not required "where collateral estoppel is being asserted defensively against a party who has already had a full and fair opportunity to litigate the issue," as is the case here. *See id.* at 844–45. To be an enforceable final judgment under Michigan law, however, the ruling must be expressed in a written order, not an oral pronouncement. *Tiedman v. Tiedman*, 255 N.W.2d 632, 634 (Mich. 1977). Because the state court's written order did not include its oral statements addressing the release-dismissal agreement, and thus, that question of law was not determined by a "final judgment," this Court found that the first element for collateral estoppel was not satisfied. *See Marshall*, 479 F. App'x at 665.

After that decision, however, the state court amended its written order to incorporate explicitly "the reasons stated on the record during the June 21, 2007 Plea Hearing, [and] the August 14, 2007 Hearing on [Marshall's] Motion for Trial Date," and to provide that the release-

dismissal agreement "was voluntarily, understandingly[, and] freely made." This amended judgment is a final judgment under Michigan law, and it has collateral-estoppel effect as to Marshall's claims. *See Tiedman*, 255 N.W.2d at 634; *Estes*, 751 N.W.2d at 500. The amended judgment is properly considered *nunc pro tunc*, now for then, because it merely corrects a clerical omission from the state court's previous written order, and does not otherwise change or alter the previous written order. *See Sleboede v. Sleboede*, 184 N.W.2d 923, 925 (Mich. 1971). A *nunc pro tunc* order "record[s] that which was actually done, but omitted to be recorded." *Id.* at 925 n.6. Because the state court orally ruled on the validity of the release-dismissal agreement, the *nunc pro tunc* order simply put that ruling into writing and recorded it with the state court's original order. Thus, the state court's amended judgment has collateral-estoppel effect on Marshall's claims before this Court.

Marshall raises two arguments to attempt to defeat the collateral-estoppel effect of the state court's amended judgment. I do not find merit with either argument.

First, Marshall argues that this Court limited its remand to the district court to the consideration of only the release-dismissal agreement, and therefore, according to the mandate rule, the collateral-estoppel issue was beyond the scope of the remand. Although the mandate rule requires the district court to proceed on remand in accordance with the mandate of the appellate court and the law of the case as established on appeal, *Allard Enters. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 570 (6th Cir. 2001), limited exceptions allow the district court to reopen an issue decided on appeal, s*ee Mitchell v. Rees*, 261 F. App'x 825, 828 (6th Cir. 2008). One such exception is where "substantially different evidence [is] raised on subsequent

trial." *See id.* (internal quotation marks omitted). Here, this Court remanded this case to the district court "for a determination as to the enforceability of the release-dismissal." *Marshall*, 479 F. App'x at 661. But new evidence regarding the enforceability of the release-dismissal—the state court's amended judgment—was presented to the district court following the remand. Therefore, the district court properly addressed the collateral-estoppel issue. *See Mitchell*, 261 F. App'x at 828.

Second, Marshall argues that the state court's amended judgment is invalid due to its erroneously-transcribed date. The Michigan Court Rules provide that "all judgments and orders must be in writing, signed by the court and dated with the date they are signed." MCR 2.602(A)(1). The amended state judgment meets these criteria, except that it is incorrectly dated. In Michigan, however, such an error is considered harmless and therefore insufficient to invalidate the amended state judgment. *See* MCR 2.613(A); *People v. Lukity*, 596 N.W.2d 607, 613 (Mich. 1999) (holding that MCR 2.613(A) and its related statutes presume that a preserved, nonconstitutional error is not a ground for reversal unless it is more probable than not that the error was outcome determinative); *Bellevue Ventures, Inc. v. Morang-Kelly Inv., Inc.*, 836 N.W.2d 898, 901 (Mich. Ct. App. 2013) (finding that the failure of the court clerk to file documents, resulting in an erroneous order to strike the documents, was harmless error).

Given that the state court's amended judgment has collateral-estoppel effect on Marshall's claims before this Court because those claims depend upon the validity and enforceability of the release-dismissal agreement, I would hold that we are precluded from

deciding the merits of Marshall's claims. I would therefore affirm the judgment of the district court and dismiss Marshall's claims.

The majority's insistence that collateral estoppel does not apply rests upon two errors.

The first involves our precedent. The majority claims that it is "implicit" in our precedent that the state court in those cases ruled the relevant release-dismissal agreement valid. Maj. Op. at p. 15. The majority calls it "implicit" because those cases *never* cite to a written order containing a state court ruling upon the agreement's validity. Indeed, the cited Third Circuit case instead recounted a 10-minute verbal exchange with the trial judge, not a written order. *See Livingstone v. North Belle Vernon Borough*, 12 F.3d 1205, 1211–14 (3d Cir. 1993). As already discussed, the previous panel from this Court reviewing this case noted that the release-dismissal's validity was raised before the trial judge, and he ruled it valid. That ruling was then put into a written order. The majority cites to no precedent of this Court where we denied that a federal challenge was collaterally estopped in the face of a written state-court order issued subsequent to the state court's explicit ruling of validity.

The majority's other error involves the role of the federal judiciary in our federal system, suggesting that we possess a "fairness exception" to collateral estoppel. The majority insists that Marshall has a right to have his federal claims heard in a federal forum, because otherwise his seeking state appellate review of a successful dismissal would be awkward. *See* Maj. Op. at p. 15–16. Yet the fact remains that Marshall could have sought review from an appellate court in Michigan, and then from the Michigan Supreme Court if necessary. If he believed his federal claim was still wrongly denied, he could have sought review from the United States Supreme

Court.   Instead he seeks review in federal district court of this state court order finding the release-dismissal valid.  Collateral estoppel does not permit such review.

The majority opinion's rejection of collateral estoppel, and the potentially broad application of this precedent to future § 1983 actions, may make it appropriate for this Court to consider this an issue of "exceptional importance" and rehear this case en banc.  *See* Fed. R. App. P. 35(a)(2).

Regardless, I respectfully dissent.