NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0304n.06

No. 15-2380

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DAVID MARSHALL; CHANDRA MARSHALL, | ) | **FILED** |
| | ) | |
| Plaintiffs-Appellants, | ) | Jun 01, 2017 |
| v. | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| CITY OF FARMINGTON HILLS, a Municipal | ) | |
| Corporation, Jointly and Severally; MICHAEL | ) | ON APPEAL FROM THE |
| MEISTER; JARRETT; SODERLUND, Officers; | ) | UNITED STATES DISTRICT |
| CRONIN, Sergeants, Individually and in their Official | ) | COURT FOR THE EASTERN |
| Capacities as Farmington Hills Police Officers; | ) | DISTRICT OF MICHIGAN |
| WILLIAM DWYER, Individually and in his Former | ) | |
| Capacity as Farmington Hills Police Chief; JOHN DOE, | ) | |
| Individually and in their capacities as Farmington Hills | ) | |
| Police Supervisors, | ) | |
| | ) | |
| Defendants-Appellees. | | |

BEFORE: GRIFFIN, WHITE, and DONALD, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Plaintiff David Marshall, a Detroit police sergeant who was stopped for running a red light on his way home from work, appeals the dismissal of his Fourth Amendment false arrest and excessive force claims, First Amendment retaliation claim, and state-law false arrest and assault and battery claims against City of Farmington Hills police officers Michael Meister and James Jarrett. Marshall's wife Chandra Marshall appeals the dismissal of her state-law loss of consortium clam. We AFFIRM in part and REVERSE in part.

**I.**

This case arises from an early-morning traffic stop of Marshall's vehicle near his home in Farmington Hills. A dashboard video camera in Officer Meister's vehicle recorded much of the incident. Shortly after 1:00 a.m. on the rainy night of December 13, 2006, Marshall was driving to his Farmington Hills home in his personal vehicle after working the afternoon shift. Marshall was still in uniform. Defendant Meister was on patrol. Marshall's vehicle made a left turn at a traffic signal seconds before the light turned from red to green. Meister followed Marshall through the turn and continued following for about one minute, without activating his overhead flashing light or siren. Marshall's vehicle turned left onto a residential street, after which Meister activated his flashing light. Marshall continued driving for several seconds and then pulled up to a mailbox on the left side of the street in front of what turned out to be his home (the fourth house in on that residential street).[1]

Officer Meister approached the driver side of Marshall's vehicle on foot. Aggressive and antagonistic from the start, Meister said to Marshall, "It's more important pickin' up the mail than stoppin' for me?" DVD 01:07:02. Marshall replied, "Yeah, I'm just pulling in, man." Meister responded loudly, "Yeah, guess what? I don't care, you move, you move," and asked Marshall again, "Is it more important for you to pick up your mail than stop for me? You keep on . . . you better put this car in park, mister." DVD 01:07:21.

---

[1] Meister testified that he activated his emergency lights immediately after Marshall turned onto the residential street; Marshall testified that Meister did so later, when Marshall was pulling in front of his own house—the fourth house in. The dash-cam video does not clearly show when Meister activated his lights. The district court stated that "It . . . took approximately twelve seconds from the time Meister activated his emergency lights for Marshall to stop his car." PID 2460.

Marshall responded quietly, "Let me step out so we can have a conversation." Meister said loudly, "We'll have a conversation. Are you somebody special? Are you somebody special?" Marshall got out of his vehicle and said, "No, I'm not somebody special." Meister stated, "I'm trying to pull you over." Marshall asked, "For what?" and Meister answered, "The red light up at Inkster and Ten Mile." Marshall asserted, "The light was green when I turned"; Meister retorted, "No it wasn't"; Marshall repeated, "The light was green"; Meister responded, loudly "It was not"; and Marshall quietly responded, "okay."[2]

Meister then said, "Give me some ID," to which Marshall responded, "Do you see what I'm wearing?" Meister said, "You give me some ID and some license, you're somebody special, huh? You're somebody special, huh?" Marshall replied, "I'm Sergeant Marshall, Detroit Police Department," and Meister said, "I'm Officer Meister, Farmington Hills." Marshall then said "Nice to meet you. You got a problem with me, man. I just got off work and I'm a little tired, get your supervisor out here." Meister said, "No." 1:08:12. Marshall said, "Yes." Meister then yelled at Marshall: "I get a supervisor, guess what?" Marshall handed Meister his police identification and his driver license early on in this exchange. 1:07:46 - 1:08:16.

A moment later, Meister called for a supervisor, "I'm at a traffic stop . . . send a supervisor." In the meantime, Marshall got back in his car. Meister leaned in and said, "I have a problem?" Marshall replied, "Yeah, what's your problem man?" Meister answered, "I try to pull you over and what do you do, you don't stop." Marshall replied, "We're at my house, you didn't stop me . . . you turned your lights on at the third house in, I'm the fourth house in."

---

[2] The district court determined that Meister and Marshall debated whether the light was red or green and incorrectly determined that Marshall insisted that it was green, omitting that the exchange ended with Marshall saying quietly, "okay."

Meister then directed Marshall to "step out of the car" three times. Marshall told Meister, "Get your supervisor" several times. Marshall got out of the car, Meister placed his hand on Marshall's shoulder, and Marshall loudly and repeatedly said: "Take your hands off of me, I'll wait for your supervisor to get here." Meister then told Marshall, "Put your revolver on your front seat. You're coming back to my car with me." Marshall responded, "I'm not going anywhere with you. You have no reason to put your hands on me." Meister replied, "I don't?" Marshall countered, "No. What is your reason? What is your justification for putting your hands on me?" Meister answered, "Because I'm going to walk you back to my car." Marshall queried, "For what?" Meister answered, "I can order anyone out of the car, correct?" Marshall disagreed, saying, "What reason do you . . . what probable cause do you have to get me out of the car? You have my driver license, you have my paper work. What reason do you have to get me out of the car?"

Meister instructed, "Sir, I'm telling you right now, put your gun on the seat, then have a seat back in your car." Marshall (standing by his car) said, "I'll get back in my car. Get your supervisor." Meister said, "Like I'm afraid of you," and walked away from Marshall. Marshall, still outside his vehicle, said, "You have no reason to put your hands on me, why are you touching me?" Meister replied, "Because you're running your mouth." Marshall then remarked, "I don't want you to be afraid of me, I want you to know your law." Meister turned back, walked toward Marshall, and said, "When you are approached by an emergency vehicle you are supposed to pull over to the right. At a red light you do not go through a red light." At that point, Marshall walked toward Meister's vehicle as Defendant Officer Jarrett arrived. The dash camera continued to record the conversation, although the officers were off screen. Meister said, "You're going to see some dockets from me [inaudible]." Marshall then responded, "You're

going to see some paperwork from me for putting your hands on me, you had no reason to put your hands on me." Meister loudly said, "Put your gun down. THAT DOES IT."

Marshall again asserted several times, "you have no reason to touch me" while Meister repeated "Put your gun on the car." 1:11:45. Marshall continued "You have no reason to touch me. I'm not putting my gun on my car. Don't touch me. Wait for your supervisor to get out here. My man, you're out of control, you are out of control."

Apparently radioing the station, Jarrett said, "thirteen, we need your help." Meister said, "This is a bad day for you," to which Marshall responded, "No, it's not, stop touching me, stop touching me." Not reflected on the video but clear from the record is that while scuffling sounds are heard, Jarrett approached Marshall with a Taser, and Marshall then placed his hand on his holstered service weapon for the first time. A taser is heard on the tape; Marshall cried out, and Meister said, "I got his gun." Jarrett yelled, "You're a fool!" Marshall said, "You're tearing my coat, you tearing my coat?" Jarrett yelled, "I don't care," and Meister said, "Turn around." Heavy breathing followed and inaudible voices. Marshall then stated "we're going to talk about this . . . we will, yes, sir we will. Get my handcuffs on," and "Your supervisor out here?" Meister answered "don't worry about that."

At around 01:13:39 on the tape counter, supervisor Soderlund arrived (off screen). At approximately 01:22:36, Soderlund's conversations with Meister and Jarrett and, separately, Marshall, concluded. Marshall is heard on the tape telling Soderlund that when Jarrett "pull[ed] his Taser out" Marshall put his hand on his weapon but did not pull the weapon out. Marshall was then transported to the Farmington Hills police station, booked for interfering with an

officer, a misdemeanor under Farmington Hills City Ordinance 18-31,[3] and released on his own recognizance.

## II.

Marshall's arraignment was scheduled for January 8, 2007. On January 5, 2007, the City charged Marshall in a separate case with misdemeanor child abuse. *Marshall v. City of Farmington Hills* (*Marshall I*), 479 F. App'x 661, 662 (6th Cir. 2012). Marshall was acquitted of the child abuse charge after a trial. *Id.*

The parties later entered into and placed on the record in the state court a conditional release-dismissal agreement for the obstructing/interfering with an officer charge. The agreement provided that the prosecutor would dismiss that charge with prejudice in exchange for Marshall releasing his right to file a civil suit under 42 U.S.C. § 1983, provided that the parties could agree on the wording of a press release. *Marshall v. City of Farmington Hills* (*Marshall II*), 578 F. App'x 516, 518 (6th Cir. 2014). The parties failed to agree on language for a press release and Marshall moved for a trial date on the obstruction charge. The state court denied his motion, held the release-dismissal agreement valid and binding, and dismissed the charge. *Id.* at 518–19.

The Marshalls filed the instant action in July 2009, and the case has been on appeal twice before. Initially, the district court granted the Defendants' amended motion for summary judgment on the bases that the release-dismissal agreement barred the Marshalls' civil suit and the Marshalls were collaterally estopped from challenging the validity of the release-dismissal

---

[3] The Ordinance provides in pertinent part: "It shall be unlawful for any person to resist any police officer . . . while in the lawful discharge of his . . . duty, or in any way interfere with or hinder such a person in the discharge of his . . . duty." PID 1378-79.

agreement. *Id.* at 519. On the Marshalls' first appeal, this court reversed and remanded for the district court to evaluate the validity of the release-dismissal agreement, directing the district court to consider whether the "agreement was voluntary; [whether] there is . . . evidence of prosecutorial misconduct, and [whether] enforcement of this agreement would . . . adversely affect the relevant public interests." *Marshall I*, 479 F. App'x at 665 (alterations in original). On remand, the district court concluded that the release-dismissal agreement was valid and again granted Defendants' motion to dismiss. This court again reversed, concluding that Defendants did not meet their burden of showing either that Marshall entered into the release-dismissal agreement voluntarily or that there was no evidence of prosecutorial misconduct, and that the Marshalls' action was not collaterally estopped by the conditional release-dismissal agreement. *Marshall II*, 578 F. App'x at 520, 524–26. The district court stayed proceedings while Defendants petitioned for certiorari to the Supreme Court. Certiorari was denied on June 1, 2015. *City of Farmington Hills, Mich. v. Marshall*, 135 S. Ct. 2377 (2015).

On remand after our second decision, the district court granted Defendants' amended motion for summary judgment, dismissing all claims against the city of Farmington Hills and officers Soderlund, Cronin and Dwyer. The district court dismissed Marshall's Fourth Amendment false arrest and excessive force claims based on qualified immunity, finding that Defendants Meister and Jarrett had probable cause to taser and arrest Marshall for interfering with a police officer, PID 2479; dismissed the First Amendment retaliation claim as barred by *Marcilis v. Township of Redford*, 693 F.3d 589 (6th Cir. 2012), PID 2489; and dismissed the state-law false arrest and assault-and-battery claims on the basis of governmental immunity because "no jury could conclude that Jarrett's single use of the taser and Meister's grabbing or seizing of Marshall evidence that Meister and Jarrett intended to harm Marshall or illustrate

indifference as to whether harm would result from their actions." PID 2501; *Marshall v. City of Farmington Hills*, No. 08-CV-13257, 2015 WL 5936305, at *21 (E.D. Mich. Oct. 13, 2015). This third appeal ensued.

**III.**

Review of the district court's grant of summary judgment is de novo. *Rodriguez v. Passinault*, 637 F.3d 675, 680 (6th Cir. 2011). Under the doctrine of qualified immunity, government officials are immune from civil liability if their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999). Marshall bears the burden of showing that Defendants are not entitled to the defense. *See Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2011). The facts as alleged must show that Defendants violated a constitutional right and that the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (permitting courts to decide which step in the qualified-immunity analysis to address first). A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

**IV. FOURTH AMENDMENT CLAIMS**

**A. <u>Permissible Scope of a Traffic Stop</u>**

Marshall argues that Meister's conduct exceeded the legitimate scope of a traffic stop. Defendants claim Marshall did not raise this issue below but go on to address it, asserting that it was Marshall, not Meister, who prolonged the stop. We assume without deciding that Marshall preserved this issue.

"The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (2003) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Under *Terry*, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when he has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The reasonableness of a traffic stop is measured by the same standards for investigatory stops as stated in *Terry* and its progeny. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). "Probable cause to believe that a traffic violation has occurred is unlike probable cause . . . to detain a suspect indefinitely." *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005). Once this court determines that the basis for traffic stop is proper, it must examine whether the degree of the traffic stop's intrusion is "reasonably related in scope to the situation at hand, as judged by examining the reasonableness of the officer's conduct given his suspicions and the surrounding circumstances." *Lyons*, 687 F.3d at 764. The Supreme Court held in 2003, three years before the events at issue here, that once a vehicle is lawfully stopped for a traffic violation, an officer's order that the driver get out of the vehicle is a de minimis intrusion. *Mimms*, 434 U.S. at 111 (quoting *Terry*, 392 U.S. at 17) (driver stopped for expired license tags may be ordered out of the vehicle given officer safety concerns that accompany traffic stops). Here, Marshall got out of his vehicle voluntarily the first time, to speak to Meister. Had he not, Meister could have ordered him out of the vehicle.

Marshall asserts that once he provided his driver license and police identification, the purpose of the traffic stop was complete because Meister had what he needed to run computer checks and issue a traffic citation. *See United States v. Bell*, 555 F.3d 535, 541 (6th Cir. 2009)

("[A]n officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity would be well within the bounds of the initial stop.") (internal quotations and citation omitted) (quoting *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999)). "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *see also Davis*, 430 F.3d at 354.

It is undisputed that Meister never ran Marshall's license or police identification during the traffic stop; thus it cannot be said that Meister's continued detention of Marshall was "investigatory." Defendants do not claim the detention was brief; rather, they assert that Marshall unreasonably prolonged the detention through his own conduct. Assuming Defendants' detention of Marshall was "prolonged," to whom is it attributable? Given Meister's remarkable belligerence toward Marshall, it is not surprising that the situation quickly escalated. However, it was primarily Marshall who prolonged the traffic stop by insisting that Meister call a supervisor to the scene and by not complying with Meister's repeated commands that he surrender his weapon. Contrary to Marshall's claim, under the circumstances described, the degree of the traffic stop's intrusion was reasonably related in scope to the situation at hand. *See Lyons*, 687 F.3d at 764.

## B. <u>False Arrest</u>

A warrantless arrest by a law enforcement officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being

committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). To sustain his false arrest claim under 42 U.S.C. § 1983, Marshall must show that Defendants Meister and Jarrett lacked probable cause to arrest him. *See Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010). The probable cause inquiry depends on "'the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest,' *Devenpeck*, 543 U.S. at 152, where supported by 'reasonably trustworthy information.'" *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Whether probable cause exists is determined by the totality of the circumstances, *Illinois v. Gates*, 462 U.S. 213, 238 (1983), analyzed from a law enforcement officer's perspective. *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Logsdon*, 492 F.3d at 341 (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002)).

Marshall acknowledges that Meister had probable cause to stop him for the traffic violation, PID 2531-32, but argues that Meister and Jarrett lacked probable cause to arrest him for interfering with a police officer under Farmington Hills City Ordinance 18-31. Although Marshall asserts that he committed no crime in the officers' presence, the record is clear that Marshall refused Meister's repeated demands that he disarm himself. The question then is whether he was required to comply with Meister's demands that he do so. Given the totality of the circumstances, Meister could reasonably believe that the presence of a weapon posed a threat to his and Jarrett's safety, in light of the escalating tension. *See Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (observing that traffic stops are "especially fraught with danger to police officers."). Thus, because Marshall refused to comply with Meister's lawful demands, probable

cause existed to arrest Marshall for violating the Farmington Hills ordinance prohibiting resisting a police officer, or interfering with or hindering an officer in the discharge of his duty.

Further, on the question of qualified immunity, it would not have been clear to a reasonable officer that he could not require Marshall to disarm, or arrest him for refusing to do so. *See Saucier*, 533 U.S. at 202. It was Marshall's ultimate burden to demonstrate that Defendants are not entitled to qualified immunity, *see Robinson v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011), and he did not meet that burden.

C. **Excessive Force**

Where an excessive force claim arises in the context of an arrest, it is analyzed under the Fourth Amendment and its reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). In determining whether the force used is reasonable, courts balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake, viewing the following factors: a) the severity of the crime at issue; b) whether the suspect poses an immediate threat to the safety of an officer or others; and c) whether he is actively resisting or attempting to evade arrest by flight. *Id.* at 396. The subjective motivations of the individual officers have no bearing on the inquiry. *Id.* at 397.

The parties agree on two *Graham* factors: 1) the basis for the original stop, a traffic violation, did not constitute a severe crime, and 2) Marshall was not resisting or attempting to evade arrest. PID 2483. The dispute concerns whether Marshall posed an immediate threat to Defendants' safety such that the tasing was reasonable. Regardless whether Defendants forewarned Marshall that he was under arrest, Defendants' use of force was objectively reasonable under the circumstances because Marshall would not relinquish his gun after repeated

requests. PID 2483-87. Additionally, once Defendant Jarrett arrived on the scene, he witnessed Meister requesting that Marshall give up his service weapon and Marshall's refusal to do so. PID 2483. As Jarrett approached Marshall with a Taser, Marshall placed his hand on his service weapon. A reasonable officer in Jarrett's position thus could have believed that there was an objectively reasonable basis to taser Marshall.

For these reasons, we conclude that the district court properly determined that Defendants are entitled to qualified immunity on Marshall's § 1983 false arrest and excessive force claims.

## V. FIRST AMENDMENT RETALIATION CLAIM

The district court did not reach the underlying merits of Marshall's First Amendment retaliation claim, instead concluding that the claim was barred under *Marcilis v. Township of Redford*, 693 F.3d 589, 604–05 (6th Cir. 2012). PID 2489-90/Dist. Ct. Op. As pertinent here, the plaintiffs in *Marcilis* appealed the grant of summary judgment on their § 1983 First Amendment retaliation claim, as well as their false arrest and malicious prosecution claims. 693 F.3d at 593–94. Applying the holding of *Hartman v. Moore*, 547 U.S. 250 (2006), that a malicious prosecution claim under *Bivens* requires a showing of lack of probable cause as an element, this court in *Marcilis* held that because the defendant police officers had probable cause to arrest the plaintiff, summary judgment was proper on the First Amendment claim. *Id.* at 604. Relying on *Marcilis*, the district court determined that Marshall established the three elements of a First Amendment retaliation claim, but failed to establish the "additional requirement" of lack of probable cause under *Hartman*:

> In *Hartman v. Moore*, 547 U.S. 250 (2006), the Supreme Court held that evidencing a lack of probable cause is an element of a malicious prosecution claim asserted under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). *Id.* at 265. The Sixth Circuit later recognized that *Hartman* called

into question its line of cases "holding that 'probable cause is not determinative of the [First Amendment] constitutional question.'" *Leonard* [*v. Robinson*], 477 F.3d [347,] 355–56 [(6th Cir. 2007)]; *Kennedy* [*v. City of Villa Hills*, *Ky.*], 635 F.3d [210,] 217 n.4 [(6th Cir. 2011)]. However, in *Marcilis v. Twp. of Redford*, 693 F.3d 589, 604 (6th Cir. 2012), the Sixth Circuit concluded that a plaintiff's First Amendment retaliation claim that was based on an arrest *and later prosecution* failed because, just like the plaintiff's similarly assertedfalse arrest and malicious prosecution claims, "[w]here there is probable cause to file a criminal complaint, a plaintiff will be unable to prevail on [a] retaliation claim.". *Id.* at 604–05 (citing *Hartman*, 547 U.S. at 265–66).

In the instant case, Marshall claims he was asserting his right to question and criticize police action as guaranteed by the First Amendment and was arrested for his conduct . . . . Defendants . . . argue that Marshall's claim fails because probable cause existed for his arrest for hindering and obstructing a police officer. Marshall, on the other hand, only argues that Meister's comments that Marshall was "running his mouth" evidence that [] Meister and Jarrett's treatment of him was motivated by his protected speech.

The Court finds that Marshall's First Amendment retaliation claim is barred because . . . there was probable cause for Marshall's arrest under the local statute. Accordingly, just as in *Marcilis*, where there was probable cause for Marshall's arrest, he cannot sustain his First Amendment retaliation claim. *Marcilis*, 693 F.3d at 604.

PID 2488-90/Dist. Ct. Op.

Although our precedent suggests that lack of probable cause may be an element of a

retaliatory arrest claim *only when accompanied by a malicious prosecution claim*,[4] which is not

---

[4] In *Kennedy v. City of Villa Hills*, *Ky.*, 635 F.3d 210 (6th Cir. 2011), a First Amendment retaliatory arrest case, this court observed that it had not decided whether lack of probable cause is an element of a retaliatory arrest claim, but suggested that it is not:

The Sixth Circuit has not decided whether lack of probable cause is an element in wrongful-arrest claims after the Supreme Court's ruling in *Hartman v. Moore*, 547 U.S. 250 (2006), which made lack of probable cause an element for claims of malicious prosecution. *Leonard* [*v. Robinson*], 477 F.3d [347,] 355 [(6th Cir. 2007)]. *Hartman* was about inducement to prosecute, which involves causal chains that are "usually more complex than . . . in other retaliation cases." *Id.* at 261, 126 S. Ct. 1695.

We applied *Hartman* to claims of retaliatory prosecution and wrongful arrest in *Barnes v. Wright*, 449 F.3d 709, 717–20 (6th Cir. 2006). In *Barnes*, *Hartman*'s "concerns regarding the intervening actions of a prosecutor d[id] not apply" to the

the case here, affirmance is nevertheless required because we must apply *Reichle v. Howards*, 132 S. Ct. 2088 (2012). *Reichle* held that it was not clearly established at the time of the defendant's arrest in June 2006 (six months before Marshall's arrest in the instant case) that an arrest supported by probable cause could violate the First Amendment. *Id.* at 2093; *see also Wilson v. Village of Los Lunas*, 572 F. App'x 635, 643 (10th Cir. 2014) (observing that the Supreme Court in *Reichle* declined to decide whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the arrest, instead holding that the circuit court had erred in concluding the law was clearly established in June 2006). Although the

---

plaintiff's retaliatory-prosecution claim because the arresting officers initiated grand-jury proceedings themselves. *Id.* at 720. Because *Hartman* said that retaliatory-prosecution claims "usually"–not always–involve complex causal chains, however, the absence of probable cause was still an element for the claim of retaliatory prosecution. The absence of probable cause was also an element for the claim of wrongful arrest because that claim was factually interrelated to the allegedly retaliatory prosecution in two ways. First, the arresting agents initiated grand jury proceedings against the plaintiff. Second, they arrested the plaintiff only after the grand jury had indicted him. Thus, *Barnes* governs the applicability of *Hartman* to claims of wrongful arrest *only when prosecution and arrest are concomitant*.

Unlike the plaintiff in *Barnes*, Kennedy has raised an ordinary retaliation claim. Following the commonplace pattern for allegedly retaliatory arrests, [defendant officer] Schutzman arrested Kennedy prior to any prosecutorial or grand jury involvement. The straightforward connection between Schutzman's alleged animus and the arrest that he effectuated suggests that Kennedy may not need to demonstrate a lack of probable cause to succeed on his claim of wrongful arrest. *See, e.g., CarePartners LLC v. Lashway*, 545 F.3d 867, 877 n.7 (9th Cir. 2008) (limiting *Hartman* to retaliatory-prosecution actions in which the absence of probable cause is "need[ed] to 'bridge' a causation gap"). *We defer resolution of this question, however, because it does not decide this appeal.* If the absence of probable cause is not an element, then . . . Kennedy should prevail because he satisfies the three actual elements [of a retaliatory arrest claim]. If the absence of probable cause is an element, then Kennedy still should prevail because the Fourth Amendment analysis shows that [the defendant officer] lacked probable cause for the arrest.

*Id.* at 217 n.4 (emphasis added).

district court did not dismiss Marshall's First Amendment retaliatory use of force and retaliatory-

arrest claims on qualified immunity grounds, *Reichle* is nevertheless dispositive:

> Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause. This Court has never held that there is such a right.
>
> . . . .
>
> Shortly before Howards' arrest, the Sixth Circuit held that *Hartman* required a plaintiff alleging a retaliatory arrest to show that the defendant officer lacked probable cause. *See Barnes v. Wright*, 449 F.3d 709, 720 (2006) (reasoning that the *Hartman* "rule sweeps broadly"). That court's treatment of *Hartman* confirms that the inapplicability of *Hartman* to arrests would not have been clear to a reasonable officer when Howards was arrested. Moreover since Howards' arrest, additional Courts of Appeals have concluded that *Hartman*'s no-probable-cause requirement extends to retaliatory arrests. *See, e.g., McCabe v. Parker*, 608 G.3d 1068, 1075 (C.A. 8 2010); *Phillips v. Irvin*, 222 Fed. Appx. 928, 929 (C.A. 11 2007) (*per curiam*). As we have previously observed, "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999).
>
> *Hartman* injected uncertainty into the law governing retaliatory arrests, particularly in light of *Hartman*'s rationale and the close relationship between retaliatory arrest and prosecution claims. This uncertainty was only confirmed by subsequent appellate decisions that disagreed over whether the reasoning in *Hartman* applied similarly to retaliatory arrests. Accordingly, when Howards was arrested it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. Petitioners Reichle and Doyle are thus entitled to qualified immunity.

*Reichle*, 132 S. Ct. at 2094, 2096–97.

Marshall cites no authority supporting that *Reichle* does not govern here.

## VI.    STATE-LAW FALSE ARREST CLAIM

To prevail on a false arrest claim under Michigan law, a plaintiff must prove that his

arrest was not supported by probable cause. *Peterson Novelties, Inc. v. City of Berkley*,

672 N.W.2d 351, 362 (Mich. Ct. App. 2003). Because Defendants had probable cause to arrest Marshall for interfering with an officer, Marshall's state-law false arrest claim fails.

## VII.   STATE-LAW ASSAULT AND BATTERY CLAIMS

Under Michigan law, an assault is "any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991); *see also* Mich. Civil Jury Instruction 115.01; *Mitchell v. Daly*, 350 N.W.2d 772, 778–79 (Mich. Ct. App. 1984) (adopting Restatement of Torts, 2d, §§ 21, 32: "an actor is subject to liability to another for assault if he acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and the other is thereby put in such imminent apprehension.")[5]

A battery "is the willful or intentional touching of a person against that person's will by another." Mich. Civil Jury Instruction 115.02, citing *Tinkler v. Richter*, 295 N.W. 201 (Mich. 1940).

---

[5] The *Mitchell* court clarified:

> It is our inclination to adopt the above definition from the Restatement and to hold that the intent necessary to make out a tortious assault is ***either*** an intent to commit a battery or an intent to create in the victim a reasonable fear or apprehension of an immediate battery. This is presently the rule in criminal assault. While recognizing the reasons for and maintaining the distinction between civil and criminal assault and battery, we do not see any reason why there should be a more culpable standard in tort law than in criminal law.

350 N.W.2d at 779 (emphasis added) (footnote omitted).

In *Odom v. Wayne County*, 760 N.W.2d 217 (Mich. 2008), the Michigan Supreme Court reaffirmed and applied the intentional-tort immunity test of *Ross v. Consumers Power Co.*, 363 N.W.2d 641 (Mich. 1984):

> [W]e provide these steps to follow when a defendant raises the affirmative defense of individual governmental immunity.  The court must do the following:
>
> . . . . (2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort. . . .
>
> (4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity under the *Ross* test by showing the following:
>
> > (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
> >
> > (b) the acts were undertaken in good faith, or were not undertaken with malice, and
> >
> > (c) the acts were discretionary, as opposed to ministerial.

*Odom*, 760 N.W.2d at 229.

Marshall argues that fact issues remain regarding whether Meister and Jarrett acted with malice.[6]  Appellant Br. 55.  "The good-faith element of the *Ross* test is subjective in nature.  It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent."  *Odom*, 760 N.W.2d at 229.  The proponent of individual immunity must therefore establish that he acted without malice.  *Id.* at 225.

In addressing Marshall's assault and battery claim, Defendants' only reference to whether they acted in bad faith or with malice is, "Nor can it be refuted that the officers had a subjective

---

[6] There is no dispute that Meister and Jarrett undertook the challenged acts during the course of their employment and that their acts were discretionary, rather than ministerial.

good faith belief that . . . the force used was necessary to separate Plaintiff from his firearm . . . . As such, governmental immunity also applied to warrant dismissal of Plaintiff's state law claims." Appellee Br. at 39-40.

A reasonable jury could conclude that Meister and Jarrett acted in bad faith under Michigan's subjective standard, which differs from the objective standard governing qualified immunity under federal law, *see Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011). When Marshall first requested that Meister call a supervisor, Meister yelled at Marshall, "I get a supervisor, guess what?" Meister testified that what he meant was that he would write Marshall a traffic citation, but a reasonable jury could draw a less benign inference. And even if a jury believed that testimony, it could still conclude that Meister maliciously threatened to issue Marshall a ticket in retaliation for requesting a supervisor. Later, Meister placed his hand on Marshall's shoulder, prompting Marshall to protest, "Why are you touching me?" Meister replied, "Because you're running your mouth." After Meister said, "You're going to see some dockets from me," Marshall responded that he was going to file a complaint against Meister "for putting your hands on me." When Marshall repeated that Meister should call a supervisor and protested again that Meister not touch him, Meister said, "Sir, guess what, this is a bad day for you."

On the audio recording from the videocam, Marshall is heard telling Soderlund that after Jarrett arrived, Meister and Jarrett "started putting their hands" on him, that Meister reached for Marshall's weapon and told Marshall to put his gun on his car, and that Marshall responded that Meister had no reason to touch Marshall's gun. Marshall also tells Soderlund that Jarrett then approached Marshall with a Taser, at which point Marshall placed his hand on his service weapon, which was holstered, and said, "you have no reason [to taser me], you are unjustified."

Immediately after, Jarrett used the Taser on Marshall, Meister said, "I got his gun," and Jarrett yelled, "You're a fool," and "Buddy, it's been awhile [sic] since you been tased!"

It is undisputed that Marshall never drew his weapon and that he did not place his hand on his holstered weapon until after Jarrett approached him with the Taser while Meister and Jarrett sought to take control of Marshall's service revolver. Viewing the totality of the circumstances as shown by the tape and the testimony, reasonable jurors could come to different conclusions. A jury could reasonably conclude that Meister and Jarrett used the Taser on Marshall in good faith, i.e., out of fear for their safety because Marshall was armed. Alternatively, a jury could reasonably conclude that Meister and Jarrett had no fear that Marshall would use his weapon, understood that he was simply protecting it, and used the Taser maliciously with intent to retaliate against Marshall for questioning their authority. Thus Defendants failed to carry their burden as proponents of individual immunity of showing that there is no genuine issue regarding whether they acted without malice, *see Odom*, 760 N.W.2d at 225, and the district court improperly granted summary judgment on the state-law assault and battery claims.

## VIII. JUDICIAL BIAS CLAIM

Marshall cites no authority in support of his argument that the district court was biased against him; thus we deem the argument forfeited and decline to address it. *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005); *see also* Fed. R. App. P. 28(a)(8)(A) (requiring that an appellant's brief state "contentions and the reasons for them, with citations to . . . authorities").

**IX.**

For the reasons stated, we AFFIRM the grant of summary judgment on Marshall's Fourth and First Amendment claims and on the state-law false arrest claim, and REVERSE the grant of summary judgment on governmental immunity grounds on Marshall's state-law assault and battery claims, and Chandra Marshall's derivative loss-of-consortium claim. On remand, the district court is free to reconsider its exercise of supplemental jurisdiction over the remaining state claims.

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

David Marshall refused multiple orders to surrender his revolver during an early morning argument with Farmington Hills Police Officers Michael Meister and James Jarrett. When Meister and Jarrett approached him, Marshall reached for the firearm, placing the officers in fear for their safety. Defendants reacted accordingly—they tased Marshall and secured his weapon.

My colleagues and I agree, for the most part, that Jarrett and Meister were in the right; it was Marshall, not Meister, who prolonged the traffic stop; it was Marshall's behavior in refusing to disarm, and in touching his weapon, that justified defendants' decisions to tase and arrest him; and it was Marshall who failed to establish that defendants had any reason to believe that a proper arrest could implicate his First Amendment rights. However, I part ways with the majority when it comes to plaintiff's assault and battery claim, for there, the court discounts his responsibility. It was Marshall who acknowledged that he "placed his hand on his service weapon" after repeatedly telling defendants he did not intend to surrender it. He cannot now claim that defendants should have known he "was simply protecting" the firearm rather than preparing to use it. More importantly, Michigan law does not require Jarrett and Meister to make that assumption at the expense of their safety.

Because no Michigan jury could conclude that defendants' objectively reasonable use of force amounts to malice, wantonness, or a reckless disregard for the common dictates of humanity, I conclude the district court properly granted summary judgment in favor of defendants on plaintiff's assault and battery claim. *Odom v. Wayne Cty.*, 760 N.W.2d 217, 225 (Mich. 2008). I therefore respectfully dissent from Section VII of the opinion. I join the majority's opinion in all other respects.

I.

Governmental immunity for intentional torts under Michigan law is distinct from federal qualified immunity. For purposes of Marshall's excessive force claim under federal law, "the 'reasonableness' inquiry . . . is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent and motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). But underlying intent and motivation are relevant to Michigan's doctrine of governmental immunity:

> In *Odom v. Wayne County*, the Michigan Supreme Court stated that the proper method for determining whether governmental immunity applies to intentional torts, such as assault and battery, is to apply the test set forth in *Ross v. Consumers Power Co.* Under the *Ross* test, an employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the employee undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature.
>
> * * *
>
> Unlike qualified immunity under federal law, which uses an objective standard, "[t]he good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." Therefore, "[t]he proponent of individual immunity must establish that he acted without malice."

*Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011) (citations omitted). These different standards purport to explain the majority's contradictory holding: on the one hand, it concludes that defendants are not liable for excessive force because Jarrett had an "objectively reasonable basis" to tase Marshall. But on the other, it finds that defendants may be liable for assault and battery under Michigan law based on evidence of "subjective" "bad faith."

Although differences in these tests theoretically permit such a result, the facts of this case do not warrant it. In fact, the facts of most cases do not warrant it. Claims of excessive force

under the Fourth Amendment and assault and battery under Michigan law are largely uniform in outcome; a plaintiff who fails to establish one almost necessarily fails to establish the other. *See, e.g.*, *Latits v. Phillips*, 826 N.W.2d 190, 195–96 (Mich. Ct. App. 2012) (per curiam) (observing that if, under federal precedent, the defendant officer's conduct would not amount to excessive force, "then the circumstances surrounding defendant's decision to shoot Latits do not establish malice on behalf of defendant"); *VanVorous v. Burmeister*, 687 N.W.2d 132, 141–42 (Mich. Ct. App. 2004) (plaintiff's assault and battery claim foreclosed by a prior court finding that officers' did not use excessive force) *overruled on other grounds by Odom*, 760 N.W.2d at 220 n.8; *cf. Alexander v. Riccinto*, 481 N.W.2d 6, 8–10 (Mich. Ct. App. 1991) (per curiam) (finding a genuine issue of material fact on plaintiff's assault and battery and federal excessive force claims).

And even where the two claims are resolved differently, courts usually grant immunity to Michigan assault and battery claims over the federal excessive force claims because Michigan law affords officers *greater* protection than federal law. *See, e.g.*, *Bletz*, 641 F.3d at 754, 757–58. An officer who is mistaken about the proper level of force necessary to subdue an arrestee risks losing qualified immunity if "a reasonable person in the officer's position would know that the conduct complained of was unlawful." *Id.* at 750. But if that same officer can "show that he had a good-faith belief that he was acting properly in using . . . force, he is entitled to the protections of governmental immunity regardless of whether he was correct in that belief." *Latits*, 826 N.W.2d at 194; *see also Odom*, 760 N.W.2d at 229 ("A police officer would be entitled to immunity . . . if he acted in good faith and honestly believed he had probable cause to arrest, even if he later learned that he was mistaken." (footnote omitted)).

Ultimately, however, this case has more to do with what Michigan courts and federal courts have in common. Each forum may assess officer immunity through a different lens, but both agree that "[p]olice officers are not required to take unnecessary risks in the performance of their duties," particularly in conducting traffic stops. *Norris v. Lincoln Park Police Officers*, 808 N.W.2d 578, 579 (Mich. Ct. App. 2011) (per curiam); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). Jarrett and Meister have the right to use the degree of force reasonably necessary to make an arrest and to protect themselves in the course of that arrest. *Delude v. Raasakka*, 215 N.W.2d 685, 689 (Mich. 1974); *see also Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 405 (6th Cir. 2007). And because police officers are forced to make "split-second judgments" in conditions that are tense, uncertain, and rapidly evolving, we judge the reasonableness of that force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Livermore*, 476 F.3d at 405 (citation omitted). "When addressing a claim of assault and battery that allegedly occurred during the making of an arrest," Michigan judges do the same. *See Norris*, 808 N.W.2d at 579–80 ("In light of the unusual and extraordinary nature of police work, it is improper to second-guess the exercise of a police officer's discretionary professional duty with the benefit of 20/20 hindsight.").

But second guess Jarrett and Meister is just what the majority does. It reasons that defendants may have had "no fear" that plaintiff would use his firearm because "Marshall never drew his weapon" at them, and placed his hand on it only "after Jarrett approached him with the Taser while Meister and Jarrett sought to take control of Marshall's service revolver." There are at least two problems with this finding. First, my colleagues have already said the officers "could reasonably believe that the presence of a weapon," even if not drawn, "posed a threat to [their] safety." And they are right. No rule of Michigan law requires defendants to wait for the

plaintiff to draw his weapon before deciding to act. To the contrary, "[p]olice officers are not required to take unnecessary risks in the performance of their duties." *Id.* at 579. Nor did Meister and Jarrett have any reason to believe that Marshall "was simply protecting" the firearm. Plaintiff already refused his opportunity to "protect[]" the weapon when he ignored Meister's orders to leave the gun in his car. "In light of the unusual and extraordinary nature of police work," Jarrett and Meister were entitled to err on the side of caution. *Id.* at 580.

Second, noting that Marshall touched his gun only "after Jarrett approached him with the Taser" implies that plaintiff was somehow justified in reaching for his weapon in response to Jarrett's approach. He was not. And the majority tells us so in resolving plaintiff's excessive force claim. It finds "Marshall refused Meister's repeated demands that he disarm himself" and, in so doing, violated the prohibition against resisting a police officer and interfering with his duties. Unable to secure a weapon they reasonably believed posed a threat of harm to themselves and perhaps even to Marshall, defendants were justified in retrieving the taser and approaching Marshall with it in hand. Once Marshall "placed his hand on his service weapon" in response to Jarrett's approach, Jarrett had "an objectively reasonable basis" to deploy the taser. As the majority agrees, "Defendants' use of force was objectively reasonable."

The only other evidence of bad faith the majority cites is its belief that a reasonable jury could "conclude that Meister maliciously threatened to issue Marshall a ticket in retaliation for requesting a supervisor." I disagree. A jury would have no occasion to consider whether Meister "maliciously threatened to issue Marshall a ticket" because that is not at issue. Marshall did not bring a claim for malicious prosecution, and the majority itself concludes defendants had probable cause to arrest Marshall. Nor could a jury consider any alleged "retaliation." We have found Jarrett and Meister enjoy qualified immunity in the face plaintiff's claim that they

retaliated against him for exercising his First Amendment right to request a supervisor, so that question would never be put to a fact finder.

The question instead is whether, in exercising objectively reasonable force, Meister and Jarrett maliciously intended to assault and batter Marshall—i.e., to tase him with "an intent to [cause] harm." *Odom*, 760 N.W.2d at 225. It is true that under this subjective test, the fact that an officer's actions are legally justified is not always determinative of the outcome; but that fact *is* always relevant. *See id.* at 229 ("The mere existence of probable cause [to arrest and prosecute], is not the proper inquiry," "[y]et the existence of probable cause is relevant to the analysis; a claim of false arrest or false imprisonment cannot be sustained if the arrest was legal."). As Judge White has said, "evidence useful to determine objective reasonableness can also serve to evaluate good faith." *Scozzari v. Miedzianowski*, 454 F. App'x 455, 467 (6th Cir. 2012).

And here, that evidence—namely, Marshall's touching of his firearm—tips the balance in favor of defendants. It is clear even from the majority opinion that defendant's emotional response immediately before the tasing is focused on Marshall's refusal to disarm: "Meister loudly said, 'Put your gun down. THAT DOES IT.' Marshall again asserted . . . 'you have no reason to touch me' while Meister repeated 'Put your gun on the car.' Marshall continued 'You have no reason to touch me. I'm not putting my gun on my car. Don't touch me. Wait for your supervisor to get here.'" Meister's reaction after Jarrett applies the taser confirms this finding: "I got his gun."

Plaintiff himself made the connection between his weapon and the tasing when he spoke to officer Soderlund immediately after his arrest:

> [W]hat happened was your officer pulled me over for a traffic stop. I pulled over to the house, I'm off duty . . . he's yelling at me who are you somebody special. I

> say, I'm sorry, I'm off duty. He's telling me get out of the car. . . . I get out of the car, show him my ID and my driver's license, and he's pushing and grabbing on me to come back to his car. No, I'm not coming back to your car. Write me a ticket if you're going to write me a ticket . . . get your supervisor. . . you're pulling me over for a traffic stop, what is your probable cause for getting me out of my car? He has none. . . . I gave him my identification. . . . He starts grabbing on me and trying to force me into his car . . . The other guy shows up and also puts his hands on me. *Then he reaches for, telling me to give up my gun . . . . you have no reason therefore he gets his boy. Boy comes out, pulls his taser out. I put my hand on my weapon, you're not going to taser me. You have no reason, you're unjustified. I'm advising him of that, I didn't pull my weapon out, I was advising him, protecting myself. They both grab me, one of them guys tasers me and takes my weapon. What is the probable cause?*

(Emphasis added.) "You put your hand on your weapon," responded Soderlund. "[T]hat's why you were tased." By Marshall's own on-the-scene account, defendants resorted to the taser in response to his unwillingness to give up his firearm and used it only after Marshall "put [his] hand on [his] weapon."

The majority wholly discounts Marshall's refusal to obey Meister's lawful order to forfeit his handgun, claiming a jury could conclude defendants tased him in response to his request for Meister to call a supervisor. But Meister did call his supervisor, much earlier in the parties' interactions before Jarrett (the officer who actually tased Marshall) even arrived on the scene. Meister's tone may well demonstrate frustration with Marshall. But that fact, in my view, did not turn an objectively harmful situation into one whereby defendants acted maliciously. *See Oliver v. Smith*, 810 N.W.2d 57, 63–64 (Mich. Ct. App. 2010) (per curiam) (officer's laughter did not demonstrate bad faith given plaintiff's "unruly" behavior in "disturbing a police inquiry and creating a dangerous situation for the officers involved"). It was Marshall's behavior in refusing to disarm, and in touching his weapon during a tense confrontation with police, that justified defendants' decisions to use force against him.

II.

"Police officers must work in unusual circumstances. They deserve unusual protection." *White v. Beasley*, 552 N.W.2d 1, 5 (Mich. 1996); *see also Norris*, 808 N.W.2d at 579–80. Before reaching plaintiff's state law claims, we have said that Jarrett and Meister acted lawfully under the Fourth and First Amendments, had reason to believe they acted lawfully, and had reason to fear for their safety. Yet the majority concludes that a jury could find defendants acted in bad faith and with an intent to punish Marshall when they tased him. This outcome is not supported by logic, to say nothing of Michigan law. No reasonable Michigan jury could conclude that officers who acted with objectively justified force nevertheless engaged in malicious or wanton conduct or demonstrated a reckless indifference to the common dictates of humanity. *Odom*, 760 N.W.2d at 225. Accordingly, I would affirm the district court's grant of summary judgment on plaintiff's assault and battery claim in favor of defendants. I therefore respectfully dissent from Section VII of the opinion.